FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Oct 28 2021

KEVIN P. WEIMER, Clerk
By: s/Kari Butler
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION FILE |
| DEMETREZ REESE, | NO. 4:20-CR-28-WMR-WEJ-1 |
| Defendant. | |

## **NON-FINAL REPORT AND RECOMMENDATION**

On November 17, 2020, the grand jury returned a single-count Indictment [1] against defendant, Demetrez Reese, charging him with knowingly possessing a firearm in and affecting interstate commerce as a convicted felon. Mr. Reese filed a Preliminary Motion to Suppress Statements [17] and a Motion to Suppress Evidence and Statements [18], both arising out of his interaction with law enforcement on July 31, 2020, at his residence, located at 1215 Vanderbilt Drive, Dalton, Georgia.

The undersigned conducted a hearing on said Motions on May 12, 2021 [22], which has been transcribed [29] ("Tr."). Based on the testimony and documents received at that hearing, and after consideration of the briefs of counsel (Def.'s Br. [35]; Gov't Resp. [37]), the undersigned **RECOMMENDS** that Mr. Reese's

Preliminary Motion to Suppress Statements [17] and his Motion to Suppress Evidence and Statements [18] be **DENIED**.

## I.     STATEMENT OF FACTS

On July 31, 2020, officer Joshua Bethune, a patrol officer with the Dalton Police Department, responded to a domestic disturbance at Mr. Reese's residence, 1215 Vanderbilt Drive in Dalton, Georgia. (Tr. 4-5.) Upon arriving at the residence, Mr. Reese provided officer Bethune with his name and date of birth. (Id. at 6.) After completing that call, officer Bethune transported Mr. Reece's roommate to jail. (Id. at 6.) While preparing his report of the domestic incident, officer Bethune ran Mr. Reese's information and discovered that someone with the same social but a different birth date had an outstanding warrant for assault with a deadly weapon in Volusia County, Florida. (Id. at 7-8.) Officer Bethune contacted dispatch and received confirmation from the originating agency that the outstanding warrant was for Mr. Reese. (Id. at 7-8.)

Officer Bethune returned to 1215 Vanderbilt Drive with officer Kendrick Johnson, officer Nick Hill, and officer Jenkins to contact Mr. Reese. (Tr. 9.) Officers Bethune, Johnson, and Hill approached the front door of the residence and knocked. (Id. at 10-11.) Mr. Reese answered the door and was asked to step outside. (Id. at 11.) Without incident, Mr. Reese complied. (Id.) The officers

2

advised Mr. Reese of his outstanding warrant and placed him in handcuffs. (Id.) Officer Bethune conducted a search of Mr. Reese incident to arrest, at which point he discovered a "bag of what we believed to be marijuana." (Id. at 11-12, 26.) In response to the discovery, Mr. Reese stated, "Oh, yeah, that's my weed." (Id. at 12, 27.)

After the search incident to arrest was complete, Mr. Reese asked the officers if they could go inside the residence and get his bank card. (Tr. 12.) Mr. Reese's request was not in response to any threat or promise made by any officer. (Id.) Nor did any officer ask to enter the residence before Mr. Reese made his request. (Id. 12-13.) Officer Bethune explained to Mr. Reese that he would have to go inside with the officers to retrieve the bank card. (Id. at 13.) Mr. Reese agreed and accompanied officers Bethune, Hill, and Johnson into the residence. (Id. at 13.) Still handcuffed, Mr. Reese verbally directed the officers to his bedroom located on the first floor of the residence. (Id.) Upon reaching Mr. Reese's bedroom, officer Bethune remained in the doorway while officers Hill and Johnson entered the room with Mr. Reese. (Id. at 14.) After entering the room, Officer Hill observed a box of ammunition sitting on a dresser but did not immediately pursue it. (Id. at 61.)

Mr. Reese began directing the officers where to search for the bank card. (Tr. 14.) The officers only searched where Mr. Reese explicitly directed them. (Id. at 15.) Mr. Reese would verbally indicate where he wanted the officers to search, and the officers would confirm by asking "you are talking about right here," or "are you talking about this drawer." (Id. at 31.) Mr. Reese consistently responded to each officer's question with a verbal "yes." (Id. at 31.) At no point did Mr. Reese ask any of the officers to stop searching, nor did any officer search in any place other than where Mr. Reese directed them to look.[1] (Id. at 15.)

After looking in several places, Mr. Reese directed the officers to look in the top right dresser drawer and told them to "open it up." (Tr. 15, 29-31.) Officer Johnson confirmed with Mr. Reese by asking, "This dresser right here?" (Id. at 43.) Mr. Reese responded "Yes." (Id.) Officer Johnson opened the top right dresser drawer and stated, "Hey, there is a gun in here." (Id. at 15, 32, 44-45.) In response, Mr. Reese stated, "That's not mine." (Id. at 16, 32.) At that point, officer Bethune stopped the search for the bank card and the officers escorted Mr. Reese out of the house. (Id. at 15, 45, 53-54, 60.)

---

[1] Officer Hill testified that Mr. Reese did ask the officers to look for his bank card in the kitchen, but that "we were only there for maybe a minute." (Tr. 59.)

4

Officer Bethune took Mr. Reese to his patrol car where he searched him again, advised him that he was under arrest, and read him his Miranda rights. (Tr. 17, 62.) Mr. Reese indicated that he understood his rights and agreed to speak with the officers. (Id. at 18.) In a conversational tone, officer Bethune asked Mr. Reese about the firearm. (Id. at 18.) Mr. Reese reiterated that it was not his and that he had never touched it. (Id. at 18-19.) Officer Jenkins then asked Mr. Reese why it was in his dresser in his room. (Id. at 19.) Mr. Reese responded by explaining that it had originally been in another location in the house and that he had picked it up and placed it in his dresser "to keep it safe." (Id. at 19.) At no point did any officer make any threats or promises to Mr. Reese to get him to speak with them. (Id. at 18.) No officer unholstered or brandished a weapon during this questioning. (Id.)

After questioning Mr. Reese, officer Bethune went back inside the residence to collect the firearm from the dresser. (Tr. 20.) Along with the gun, officer Bethune collected the box of ammunition originally seen by officer Hill off the top of the dresser. (Id.) Officer Bethune then exited the residence and secured the firearm and ammunition in his patrol car. (Id. at 21.)

Mr. Reese then requested that the officers again go back inside and retrieve his hygiene bag. (Tr. 22.) Mr. Reese accompanied officer Hill into the residence and directed him to his bedroom and the top shelf of his closet where the hygiene

5

bag was located. (Id. at 22, 64.) Officer Hill retrieved the hygiene bag and searched it for weapons and contraband. (Id. at 64-65.) Nothing of significance was found during this initial search of the hygiene bag. (Id. at 65.) Officer Hill then escorted Mr. Reese along with the hygiene bag back outside and turned both over to officer Bethune. (Id. at 23, 65.) Mr. Reese's request to retrieve his hygiene bag was not in response to any promises or threats made by any officer. (Id. at 22.)

Officer Bethune escorted Mr. Reese to the Whitfield County Sherriff's Office Jail for processing. (Tr. 23, 65.) Upon arrival at the jail, Mr. Reese and his belongings were searched by Corrections Officer Christopher Cline. (Id. at 78.) During the processing search, officer Cline discovered an additional firearm magazine in Mr. Reese's hygiene bag. (Id. at 78.) The newly discovered magazine was turned over to officer Bethune and Mr. Reese was booked. (Id. at 79.)

## II. DISCUSSION

Mr. Reese argues that his Preliminary Motion to Suppress Statements and his Motion to Suppress Evidence and Statements should be granted because the officers did not obtain a search warrant before searching his home, and his purported consent was involuntary and merely acquiescence to a claim of lawful authority. (Motion to Suppress [18] 2-3.) Mr. Reese also contends that any

statements he made were involuntary and therefore inadmissible because he was questioned in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Id. at 3.)

The government responds that Mr. Reese voluntarily provided officers consent to search his bedroom, and that the exclusionary rule should not apply to evidence recovered from the residence given the "voluntary consent" exception. (Gov't Resp. [37] 6-10.) As for Mr. Reese's statements, the government asserts that any statements made before an officer issued the Miranda warnings were voluntarily and not in response to governmental questioning. (Id. at 11-13.) Finally, the government contends that any statements made by Mr. Reese after receiving the Miranda warnings from Officer Bethune were not taken in violation of his Fifth or Six Amendment rights. (Id. at 14-15.)

### A.     Motion to Suppress Evidence

The Fourth Amendment to the Constitution of the United States sets forth a general proscription on warrantless searches of a person's residence: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV. The Fourth Amendment's prohibition of warrantless searches, however, is not absolute. Although there is a strong preference for searches and entries conducted under the judicial auspices of a warrant, the Supreme Court has crafted a few

7

specifically established and well-delineated exceptions to the warrant requirement. California v. Acevedo, 500 U.S. 565, 580 (1991).

A warrantless search pursuant to voluntary consent is one of the exceptions to the warrant requirement. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority, but rather was given freely and voluntarily. United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987); see also United States v. Holloway, 290 F.3d 1331, 1337 (11th Cir. 2002) (explaining that "the burden of proving an exception to the warrant requirement lies with the Government").

In other words, consent to conduct a search is voluntary if it is the product of an "'essentially free and unconstrained choice.'" United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth, 412 U.S. at 225). Voluntariness of consent depends on the totality of the circumstances. Id. In evaluating voluntariness, district courts are directed to examine several factors, including "the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found." Id.

First, in considering the totality of the circumstances here, the undersigned reports that the officers did not engage in coercive police procedures. See United States v. Drayton, 536 U.S. 194, 204 (2002) (no coercion when "there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice"). No officer claimed to have a search warrant, nor did any officer seek permission to enter the home for any reason. Likewise, Mr. Reese was not threatened or promised anything in return for his consent to search the residence. The evidence shows that the officers obliged Mr. Reese's requests and spoke to him in a calm conversational tone without their weapons drawn.

Second, with regard to cooperation, there is no indication that Mr. Reese was uncooperative at any point. Rather, the evidence shows that it was the officers' cooperation with Mr. Reese's requests that led to the discovery of the firearm in his bedroom. Third, although the officers did not inform Mr. Reese of his right to refuse consent to the search, they did not initiate the entry into his bedroom. Mr. Reese's requests for officers to retrieve his bank card and hygiene bag were unsolicited and he could have ended the search at any time. Moreover, the government is not required to inform suspects of the right to refuse consent. Schneckloth, 412 U.S. at 231-32. Fourth, the record contains no evidence of Mr.

Reese's education and intelligence. Finally, it is safe to assume that Mr. Reese requested that the officers enter the residence and conduct a search for his bank card and hygiene bag because he believed that no incriminating evidence would be found. United States v. Barrueta, No. 208-CR-91-FTM-29SPC, 2008 WL 4642793, at *15 (M.D. Fla. Oct. 17, 2008) ("The fact that the Defendant so readily agreed to the search is a strong indication the Defendant did not believe anything illegal would be found . . . .").

In sum, but for Mr. Reese's own requests for the officers to retrieve his bank card and hygiene bag, no officer would have entered the residence to search. Thus, Mr. Reese did not acquiesce to any claim of lawful authority and he gave consent freely and voluntarily. Accordingly, Mr. Reese's Motion to Suppress Evidence should be denied.

### B. Motion to Suppress Statements

Mr. Reese has filed a Preliminary Motion to Suppress Statements and a Motion to Suppress Evidence and Statements. However, he has not identified any specific statement that he would like to have suppressed. He simply seeks the suppression of "any and all statements allegedly made . . . which are not found to be voluntary." (Motion to Suppress [17] 1.) The Court must therefore assume that he seeks suppression of all his statements. Thus, the undersigned addresses the

10

voluntariness and admissibility of both Mr. Reese's pre-Miranda and post-Miranda statements below.

### 1. Pre-Miranda Statements

In Miranda, the Supreme Court held that a suspect who is in custody must be advised of his rights to remain silent and to the assistance of counsel before any interrogation by law enforcement. Here, the government concedes that Mr. Reese was in custody and that he made statements before receiving Miranda warnings. Thus, the question is whether those pre-Miranda statements were made in response to governmental questioning; if not, the protections of Miranda do not apply. See United States v. Acosta, 363 F.3d 1141, 1148 (11th Cir. 2004) ("The right to *Miranda* warnings attaches when custodial interrogation begins.").

The Supreme Court in Miranda explained that "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. However, the Supreme Court has also made clear that "the special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation." Rhode Island v. Innis, 446 U.S. 291, 300 (1980); see also Minnesota v. Murphy, 465 U.S. 420, 430 (1984) ("We have consistently held [that

11

Miranda's] extraordinary safeguard 'does not apply outside the context of the inherently coercive custodial interrogations for which it was designed.'" (quoting Roberts v. United States, 445 U.S. 552, 560 (1980)).  For purposes of Miranda, an interrogation occurs whenever a person in custody is "subjected to either express questioning or its functional equivalent."  Innis, 446 U.S. at 300-01.  The functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

Here, the undersigned reports that Mr. Reese was not "interrogated" within the meaning of Miranda before being apprised of his rights.  Mr. Reese was not subjected to express questioning, nor can it be fairly concluded that he was subjected to the "functional equivalent" of questioning.  Rather, after his arrest, Mr. Reese initiated further interactions when he requested that the officers retrieve his bank card from inside the residence.  Thus, it cannot be said that the officers should have known that their lawful search incident to arrest or their subsequent compliance with his request was reasonably likely to elicit an incriminating response from Mr. Reese.  In short, the evidence shows that Mr. Reese's pre-Miranda statements were "given freely and voluntarily without any compelling influences." Innis, 446 U.S. at 299-300 ("Volunteered statements of any kind are

12

not barred by the Fifth Amendment . . . ."). Accordingly, because there was no custodial interrogation, Mr. Reese's pre-Miranda statements should not be suppressed.

### 2. Post-Miranda Statements

Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989). A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, courts must determine whether the Miranda waiver was valid. A defendant validly waives his Miranda rights only if the totality of the circumstances shows both of the following: (1) an uncoerced choice and (2) an awareness "of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). "Waiver may be established even absent formal or express statements of waiver." United States v. Thomas, No. 4:13-CR-22-RLV, 2014 WL 793359, at *9 (N.D. Ga. Feb. 25, 2014). In fact, "'a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police.'" Id. (quoting Berghuis v. Thompkins, 560 U.S. 370, 388-89 (2010)).

13

Second, even where the Government has complied with the requirements of Miranda, the Court must consider whether the confession or self-incriminating statements were voluntary. United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); United States v. Sims, 719 F.2d 375, 378 (11th Cir. 1983). The Court must examine the "totality of the circumstances, including the details of the interrogation and the defendant's characteristics" when determining whether statements were voluntary. United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010). "The determinative question asked is whether there has been police overreaching." United States v. Bercoon, No. 1:15-CR-022-LMM-JFK, 2016 WL 9404865, at *8 (N.D. Ga. Nov. 1, 2016), R. & R. adopted, 2017 WL 3151291 (N.D. Ga. July 24, 2017). Factors the Court must consider include "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003).

With regard to the first prong of the inquiry, the undersigned reports that officers read Mr. Reese his Miranda rights and that Mr. Reese "voluntarily, knowingly, and intelligently" waived those rights. Moran, 475 U.S. at 421. Mr. Reese was not threatened or promised anything to induce his cooperation. Hearing testimony reflects that officers spoke in a calm and conversational tone without

14

brandishing their weapons. Moreover, Mr. Reese indicated that he understood his rights as they were read to him and agreed to speak with the officers. Thus, even absent formal or express waiver, "waiver can be clearly inferred from the actions and words of [Mr. Reese]." North Carolina v. Butler, 441 U.S. 369, 373 (1979).

With regard to the second prong, for the same reasoning set forth above, the undersigned reports that Mr. Reese's post-Miranda statements were voluntary and not the result of police overreaching. Accordingly, Mr. Reese's post-Miranda statements should not be suppressed.

### III. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Mr. Reese's Preliminary Motion to Suppress Statements [17] and his Motion to Suppress Evidence and Statements [18] be **DENIED**.

**SO RECOMMENDED**, this 28th day of October, 2021.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE